## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY

In re:                                                  )
                                                        )
JULIE MARIE WOOD                                        )          CASE NO. 18-32555
                                                        )          CHAPTER 7
                              Debtors                   )
_____)

## MEMORANDUM OPINION

This case comes before the Court on the Motion to Convert From Chapter 7 to Chapter 13 (the "Motion") filed by Julie Marie Wood (the "Debtor"). The Motion is somewhat brief, and simply states that the Debtor is eligible to be a debtor under Chapter 13 of the Code and desires to convert this matter to a case under that Chapter. Both Michael E. Wheatley, the Chapter 7 Trustee, and Creditor Janice Gerstenecker ("Gerstenecker") objected to the Motion. The Court conducted an evidentiary hearing on the Motion on April 23-24, 2019. At the hearing, the Debtor, the Chapter 7 Trustee, and counsel for Gerstenecker all appeared. Based upon the testimony presented, the exhibits introduced at trial, the argument of counsel, and the record in this case, the Court concludes that the Motion must be denied.

The Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

## FINDINGS OF FACT

### A.  The Debtor

The Debtor is a single, middle-aged mother of two children. She is a licensed physical therapist, with a four year degree in biology from the University of Kentucky, as well as a two year graduate degree from Bellarmine University. The Debtor has a long work history, wherein she has held multiple jobs since completing her education. The Debtor is not a financially unsophisticated

person as she claims, with no understanding of financial matters. Indeed, the Debtor has handled financial matters throughout her adult life, including the filing of multiple tax returns, borrowing funds to finance her education, and borrowing funds to pay off those student loans. The Debtor is in charge of her household, and handles all the financial matters associated therewith, including the care and education of her children.

## B.  The Loan

In 2014, the Debtor was married to Gerstenecker's son, Adam Gerstenecker. To finance the Debtor's second degree from Bellarmine, the Debtor took out certain student loans. On or about September 16, 2014, Gerstenecker loaned the Debtor $78,444.02 to pay off the above-referenced student loans. The Debtor made four monthly installment payments to Gerstenecker on the loan. Once the Debtor and her former spouse began having marital difficulties and a divorce was imminent, the Debtor stopped making payments on the loan to Gerstenecker.

Gerstenecker filed suit against the Debtor in Alabama state court in December of 2015. Gerstenecker prevailed at the trial court, which entered a judgment in favor of Gerstenecker for the loan balance. The Debtor appealed, and the case eventually reached the Alabama Supreme Court.

On May 19, 2017, the Alabama Supreme Court affirmed the trial court's judgment, finding that the transaction between Gerstenecker and the Debtor was a loan, rather than a gift as claimed by the Debtor. The Alabama Supreme Court reversed, however, on the amount of the damages award because it appeared that the trial court had erroneously read into the contract an acceleration-of-payments clause. The matter was remanded back to the trial court to calculate the amount owed based upon the accrued payments as of the date of the judgment. A final judgment was entered on September 11, 2017, in the amount of $30,300.00 (the outstanding balance on the missed loan

2

payments from January 1, 2015 to September 11, 2017), plus 7.5% post-judgment interest (the "Judgment").[1] Gerstenecker claims that the full amount owed to her is $75,644.00, and, at this time, there does not appear to be any dispute as to the amount of the debt owed to Gerstenecker.

## C.  The Bank Accounts

When the Debtor was young, perhaps before she graduated from high school, the Debtor and her family members opened several bank accounts (three with PNC Bank and one with BB&T). These accounts were in the name of the Debtor and her father Jack Wood (individually or as a custodian), or the Debtor and her father and sister Jennifer Wood.  The ownership and control of these accounts is a puzzle.  The Debtor testified that she either 1) used the funds in the accounts to pay bills, including her Alabama attorney's fees, or 2) she knew of the accounts but never used the funds.  When pressed, the Debtor testified that while she did not use the bank accounts, she knew her name was on the accounts and that funds from the accounts were used to pay her bills.  She also acknowledged that she could withdraw these funds and that the funds in these accounts could have been used to pay on the debt owed to Gerstenecker.

Jack Wood testified that he used some of the funds from these accounts to help support the Debtor.  Jack Wood also testified that all the money in the accounts belonged to him.[2]  Both the Debtor's testimony and her father's testimony, however, revealed that these accounts were funded,

---

[1] At this time, the Chapter 7 Trustee has not indicated that this is an asset case.  As such, no creditors have yet filed claims.  The Court will note however, that the Debtor scheduled the debt owed to Gerstenecker based upon the September 11 judgment.  The Debtor also scheduled another $40,000.00 based upon the portion of the $78,445.00 loan not covered in the judgment.

[2] Jack Wood is an attorney and former state district court judge.  Gerstenecker presented character evidence of Mr. Wood to rebut his credibility, in the form of a suspension order entered against him by the Judicial Retirement and Removal Commission, and a second opinion and final order entered by that same commission on a different matter.

at least in part, by the Debtor's income tax refunds. Notwithstanding the origin of the funds, Mr. Wood considered the funds his, based upon his financial support of the Debtor. In his mind, when he paid a bill for the Debtor, it was not familial support, but instead a loan to be repaid from the Debtor's tax refunds. Of course, neither the Debtor nor her father kept an accounting or any bookkeeping to determine if the amount "loaned" equaled the amount taken from the income tax refunds. Mr. Wood received and kept all the bank statements on these accounts.

The Court will take a moment to stress that whatever the actual pay arrangement the Debtor had with her father on the funds in these accounts, she knew of these accounts and she knew that these accounts were funded, at least in part, by her income tax refunds.

As stated above the Alabama Supreme Court issued its opinion on May 19, 2017, and the trial court issued its final judgment on September 11, 2017. A few weeks prior to the final trial court ruling, on August 21, 2017, Jack Wood closed these four accounts and withdrew the funds. The accounts contained some $57,364.91 (BB&T --$21,728.38; PNC Acct. #1 -- 6,802.45; PNC Acct. #2 -- $6,476.31; PNC Acct. # 3 -- $22,357.77). Mr. Wood was able to accomplish these closings with just the signature of himself and Jennifer Wood, the Debtor's sister. For some unexplained reason, the Debtor's signature was not required to close the accounts to which she was a named owner. Some of the funds were deposited into new accounts in the name of Jack Wood and the Debtor's sister, Jennifer Wood. Jack Wood testified that his actions were motivated by the imminent trial court final judgment and his desire to protect the funds from Gerstenecker.

It does not appear that the Debtor received any of the funds from these four accounts, despite the fact that she funded the accounts, in part, with her income tax refunds. Jack Wood testified that he neither notified the Debtor that he was closing the accounts, nor gave her any of the funds from

4

the accounts. It was not clear, and the Court cannot find that the Debtor knew about the closings of these accounts and the disposition of the funds contained therein.

**D.  The Real Estate Business**

The Debtor testified that her father prepared her income tax returns her whole adult life. She stated this practice continued even after she married Adam Gerstenecker. She also testified that she never looked at the tax returns to insure their accuracy, but instead just signed the returns where her father directed.

On April 15, 2017, the Debtor signed her 2016 federal income tax return. The Debtor reported approximately $46,759.31 in income. Schedule E of the Debtor's 2016 federal tax return reflects the Debtor's interest in a real estate business, apparently comprised of numerous rental properties. The tax return reflected that she had income of $59,800 for rents received in 2016, and some $220,860 in losses from the real estate business. Schedule E also contained a legend indicating that the business ownership was divided as follows: J&M 60%, the Debtor 20%, and the Debtor's sister 20%. Jack Wood confirmed that this was the breakdown of the ownership of the real estate business.[3]

Based upon the Debtor's 20% ownership interest, she was able to claim a business loss of $44,012, which almost completely offset the Debtor's wage income in that year. The Debtor received a tax refund of approximately $4,798.00. These funds were deposited into one of the four bank accounts mentioned above.

---

[3] Mr. Wood also testified that there was no paperwork surrounding the ownership of this business. It was not incorporated, nor was there any sort of formal partnership agreement. He equated it to a joint venture, with no contract or written documents setting forth each party's interest in the business.

As with the bank accounts, the Debtor testified that she did not know anything about the real estate business.[4]  She was not aware that any real estate business losses had ever been claimed on her income tax returns.  Additionally, despite signing the 2016 tax return, the Debtor testified she had no knowledge of the income or losses claimed in the Tax Schedule E, nor was she aware of the rental properties listed on that schedule.  Finally, the Debtor testified she was unaware of any tax refund.

On August 20, 2018, one day before the bankruptcy petition date, the Debtor signed her 2017 federal income tax return.  Unlike the 2016 tax return, this 2017 tax return does not reflect any interest in the real estate business whatsoever.  The Debtor testified that she had no knowledge why the real estate business was no longer listed on her tax return.  She had no recollection of signing anything to give up her interest in that real estate business, nor any recollection of verbally giving up that interest.

Jack Wood testified that he simply removed the Debtor from the joint venture.  He claimed this was a unilateral decision on his part.  He also testified the Debtor received nothing in return for giving up her interest in the real estate business.  Because the Debtor contributed nothing into the real estate business, no capital contributions or other investment, Mr. Wood did not feel the Debtor was entitled to any compensation for removing the Debtor from the joint venture.  When asked how the Debtor could claim business losses for an entity to which she held no real interest, Jack Wood testified that his accountant assured him this was acceptable to the Internal Revenue Service.

_____

[4] This testimony is also supported by the amended answer filed by the Debtor in an adversary proceeding filed by Gerstenecker against the Debtor seeking to deny her discharge pursuant to 11 U.S.C. § 727.  In the amended answer, despite claiming a loss on her 2016 tax return based upon the real estate business losses, the Debtor admitted to never having any interest in the real estate business.

**E.  Events Leading to Bankruptcy**

After the Alabama Supreme Court ruled, and the Debtor divorced her ex-spouse, the Debtor moved to Kentucky.  After receiving a final judgment from the Alabama trial court, Gerstenecker began collection efforts in Alabama.  On March 5, 2018, the Debtor was served with a wage garnishment order to start payments on the Judgment.  At the time, the Debtor worked part time at Norton Healthcare as a physical therapist.  On or about June 4, 2018, Gerstenecker filed a petition to domesticate the Judgment in the Kentucky Circuit Court for Jefferson County.  On or about June 25, 2018, Gerstenecker filed a Notice of Judgment Lien on Real Estate and Real Property Owned by Julie Gerstenecker.

In the spring of 2018, the Debtor decided that she needed to work less to better accommodate her children.  Accordingly, in June 2018, shortly after the wage garnishment began, the Debtor voluntarily reduced her hours with Norton Healthcare and began working on a "PRN" basis.[5]

**F.  The Bankruptcy Petition and Schedules**

On August 21, 2018, the Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.  The Debtor testified that the wage garnishment was the primary factor in her decision to file for bankruptcy relief.  The Debtor listed no secured creditors, and listed just two unsecured creditors, Gerstenecker and the Debtor's parents.[6]  This testimony is supported by the

---

[5] "PRN" is an abbreviation for the Latin term, "pro re nata" which translates to "as needed."  PRN is commonly used by healthcare employers and professionals to describe short-term, part-time, or fill-in work by a nurse or other health professional.

[6] The debts scheduled as owing to the parents are somewhat suspect in that the Debtor based some of these amounts on funds paid by the parents for her legal fees.  The legal fees paid by the parents, however, were paid by the parents out of the accounts that were funded, at least in part, by the Debtor's own income tax refunds.  Other parts of the debts owed to the parents are based upon missed rent payments, which appear to be completely flexible, in that neither the

Debtor's sworn Schedule D and E/F.

With regard to assets, the Debtor did not list any business interests or joint ventures in her schedules or Statement of Financial Affair ("SoFA"). The business interest listed on the Debtor's 2016 tax return was not listed in the schedules or on the SoFA. Nor did the Debtor list or schedule the four closed bank accounts that she had owned either with her father or with her father and sister. Nor did the Debtor list any claims against her father to recover her portion of the funds removed by her father from the bank accounts or for her terminated interest in the real estate business.

Schedule I listed the Debtor's monthly income of $3,085.15. The Debtor qualified this amount, however, as she also included language on this schedule that "[i]n June, Debtor's status was changed to PRN (as needed). Debtor got second job at Baptist, also PRN. Debtor anticipates income to go down. Debtor onlr [sic] received one check in July from Nortons. Schedule I based on pre PRN income from Nortons." (Emphasis added).

Schedule J showed the Debtor's monthly expenses at $4,066.65. This amount included a monthly rental expense of $1,300. The Debtor leased property where she and her children lived from her parents. The only lease provided reflected a lease term from June 2015 through May 31, 2016. This lease called for monthly rent payments of $2,000. According to the Debtor, her portion of the rent was $1,300, with the remaining $700 balance being the responsibility of her sister.[7] Based upon these expenses, the Debtor's monthly disposable income (income minus expenses)

---

amount of rent nor the requirement of payment is constant.

[7] Even though this lease terminated by its term on May 31, 2016, the Debtor testified that she still leases this property from her parents. It was unclear if this is on a month-to-month basis or some other longer term arrangement. Testimony was also provided that the Debtor's sister no longer lives at the property. As such, the Debtor is solely responsible for the rent payments.

totaled negative $981.51.  In other words, the Debtor's expenses exceeded her income by almost a $1,000 every month, with the Debtor indicating her income was anticipated to go down, thereby increasing the negative monthly income even more.

On September 25, 2018, after Gerstenecker had moved for a Rule 2004 examination of the Debtor, the Debtor filed an Amended Schedule J of expenses.  Based upon the figures supplied in this schedule, the Debtor's monthly disposable income was now only negative $556.51.  The $1,300 rent figure from the original Schedule J remained unchanged, but the utility expenses were removed as the Debtor now explained that the utilities were included in the $1,300 rent payment.  Despite the Debtor anticipating her income being lowered due to a reduced work schedule in June 2018, the Debtor did not change the gross income figure on this September 2018 amendment.

### G.  The Motion to Convert

On November 14, 2018, the Debtor filed the Motion currently before the Court seeking to convert to Chapter 13.  At trial, the Debtor testified that her motive in filing the Motion was avoid increased legal fees if the case stayed in Chapter 7.  The Debtor testified that at a 2004 examination, Gerstenecker's counsel threatened her with multiple appeals if the case remained in Chapter 7.  These alleged threats were not made on the record, and thus not included in the transcription of the 2004 examination.

With the Motion, the Debtor filed another set of schedules.  In this new set of schedules, the Debtor listed for the first time the four bank accounts mentioned above.  As stated earlier, these accounts were not listed in the original Chapter 7 schedules.  Beside the PNC accounts, the Debtor included the following notation: "Checking account in name of Jack D. Wood and Julie M. Wood and Jennifer D. Wood used exclusively by debtor's father for real estate venture.  Opened by debtor's

9

father approximately in 2010, closed by father in August 2017. The debtor never deposited any
funds into this account."

Almost every provision of this notation is in direct conflict with the Debtor's testimony.
The accounts were not used exclusively for the father's real estate venture. Both the Debtor and her
father admitted the funds in these accounts were used , in part, to pay the Debtor's bills, including
her Alabama attorney's fees. Moreover, the accounts were not opened solely by the father, but were
instead opened by the father, along with the Debtor and her sister. The accounts were not opened
in 2010, but opened while the Debtor was in high school, which was years before 2010. Finally, the
Debtor's income tax refunds were deposited into these accounts.

The BB&T account contained a similar notation: "Saving and checking account in name of
Julie Marie Wood, custody of Jack D. Wood, opened approximately 20 years ago by debtor's father.
Used exclusively by debtor's father for real estate venture. Debtor would deposit tax refunds in this
account. Debtor used funds from this account to pay Alabama divorce and appeal attorneys. Closed
by father in 2017." This notation is contradictory on its face.

Turning to the schedules of income and expenses, as with the last September amendment,
these new schedules reflected the same monthly income from the original schedules, with the same
notation that the income was anticipated to go down. To date, the Debtor has never filed schedules
reflecting her reduced income, which was anticipated as early as August, 2018. In fact, the Court
cannot make a finding as to the amount of the Debtor's income, either on the August, 2018 date of
the original Chapter 7 bankruptcy petition, the date of September, 2018 amendment, the date of the
November, 2018 Motion, or the April, 2019 evidentiary hearing. The only income figures provided
are in the schedules, and the Debtor based these figures upon circumstances that changed prior to

10

the filing of the bankruptcy petition. While the Debtor did testify that her income went down as she anticipated, she did not specify by how much. The only evidence that the Court has to the actual amount of the Debtor's income is that it is lower than the $3,085.14 set forth in the original Schedule I. How much lower can not be ascertained by either the schedules (any of them) or the Debtor's testimony.

The biggest difference reflected in the new income and expenses schedules (Schedule I & J) is that in the new Schedule J of expenses, the monthly rent expense (owed to the parents) was lowered to $650 (half of the amount originally scheduled amount). The Debtor explained this change as being due to her mother agreeing to a reduced rent figure. No new rent agreement was provided evidencing this new rental agreement with the reduced rent. Based upon these new figures, the Debtor now had monthly disposable income of approximately $153.49.

With the Motion, the Debtor also filed a proposed Chapter 13 Plan (the "Plan"). In the Plan, the Debtor proposed making monthly payments of $150 for 60 months. The total amount of payments to be made to the Chapter 13 Trustee would be $9,000. After payment of Trustee fees and Debtor's attorney fees, approximately $6,617.20 would be distributed to unsecured creditors. The Plan also indicated that in a Chapter 7 case, unsecured claims would be paid $33,720.00, which is obviously more than the $9,000 proposed under the Plan. When questioned by the Court, Debtor's counsel explained this was a mistake in that he failed to exempt a retirement account. Counsel asserted that if the exemption was properly claimed, based upon the Schedule A/B of assets, unsecured creditors would receive nothing in a Chapter 7 case. To date, the Debtor has never amended her Schedule C exemptions to claim this retirement account exempt.

When asked if the case was converted to Chapter 13, would the Debtor pursue any claims

11

against her father to recover the funds removed from the four bank accounts, the Debtor responded in the negative.  Nor would she consider any claims against her father to recover whatever interest she held in the real estate venture that her father unilaterally terminated, without notice or consideration to the Debtor.  Nor would she consider any claims against her father for improperly (and perhaps illegally) completing her tax returns.

The Court will also note that on January 14, 2019, Gerstenecker initated an adversary proceeding against the Debtor.  In that case, Gerstenecker seeks to deny the Debtor a discharge pursuant to the provisions of 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4), (a)(5), and (a)(6).  The Debtor has answered and, as of this date, that proceeding is still pending.

## CONCLUSIONS OF LAW

The Debtor seeks to convert her case to Chapter 13 under the authority of § 706, which allows a debtor to convert from Chapter 7 to another chapter if the case has not previously been converted and the debtor is eligible to be a debtor under the chapter to which it is to be converted. Section 706 of the Bankruptcy Code provides as follows:

> (a) The debtor may convert a case under [Chapter 7] to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. . . .
> (d) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

11 U.S.C. § 706.

Section 109(e) sets forth certain requirements for debtors to meet to be eligible to proceed under Chapter 13.  One requirement is that a debtor must be an "individual with regular income." Section 101(30) defines "individual with regular income" as an "individual whose income is

sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 ... ."  11 U.S.C. § 101(30).

Even if a debtor meets the requirements of §§ 706(a) and 109(e), the right to convert is not absolute where cause may exist to convert or dismiss under the chapter to which the debtor seeks conversion or when denial of a conversion motion would serve to prevent "an abuse of process." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 372–75, 127 S.Ct. 1105, 1110–12, 166 L.Ed.2d 956 (2007).  In finding bad faith conduct by a debtor sufficient to deny conversion based on his ineligibility to qualify to be a debtor under Chapter 13, the Supreme Court summarized the facts in *Marrama* as follows:

> Marrama misrepresented the value of his Maine property and that he had not transferred it during the preceding year. Respondent DeGiacomo, the trustee of Marrama's estate, stated his intention to recover the Maine property as an estate asset. Thereafter, Marrama sought to convert the proceeding to Chapter 13, but the trustee and respondent bank, Marrama's principal creditor, objected, contending that the request to convert was made in bad faith and would constitute an abuse of the bankruptcy process.

*Marrama*, 549 U.S. at 365, 127 S.Ct. at 1106; *see also In re Sammut*, 486 B.R. 404, 407 (Bankr. E.D. Mich. 2012) (stating that "the Court held that the bankruptcy court can deny conversion if the debtor has acted in bad faith before seeking to convert, either during the Chapter 7 case or before the bankruptcy case.").

A debtor must not have committed "prepetition bad-faith conduct," including such conduct "in an earlier Chapter 7 proceeding." *Id.*  at 373.  The Supreme Court looked to § 1307(c), which provides that a Chapter 13 case may be dismissed for cause, for this authority.  *See id.*  The Court concluded:

> In practical effect, a ruling that an individual's Chapter 13 case

should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13.  That individual, in other words, is not a member of the class of "honest but unfortunate debtor[s]" that the bankruptcy laws were enacted to protect.  The text of § 706(d) therefore provides adequate authority for the denial of [a] motion to convert.

*Id.* at 373-74.

While *Marrama* and the statute make clear that conversion from Chapter 7 is generally left to the debtor's discretion, that right, however, is not absolute where cause may exist to convert or dismiss under the chapter to which the debtor seeks conversion or when denial of conversion would serve to prevent "an abuse of process."  *See also In re Miller*, 496 B.R. 469, 475–76 (Bankr. E.D. Tenn. 2013); *In re Mercury Data Systems, Inc.*, 586 B.R. 260, 270 (Bankr. E.D. Ky. 2018).

In any contested motion to convert, the debtor must meet the threshold requirements of § 706 that she has not previously converted her case and is eligible to be a Chapter 13 debtor after which the objecting party bears the burden of proving by a preponderance of the evidence why the debtor should not be permitted to convert  under the test imposed by *Marrama*.  *In re Condon*, 358 B.R. 317, 326 (6th Cir. BAP 2007) ("the Panel concludes that the burden of proving a lack of good faith in the context of § 706(a) is on the party opposing the conversion."); *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 757 (Bankr. D.S.C. 2007); *In re Miller*, 496 B.R. 469, 477 (Bankr. E.D. Tenn. 2013).

In this case, the Court cannot find that the Debtor has met her threshold showing.  While the Debtor has not previously converted her case, the Court cannot find that the Debtor is an individual whose income is sufficiently "*stable and regular* to enable such individual to make *payments under a plan* under chapter 13."  11 U.S.C. § 101(30) (emphasis added).  As stated above, the Court cannot

14

make a finding as to the Debtor's income.  During the trial, it was conclusively established that the
figures set forth in the original Schedule I and the new schedules filed with the Motion were based
upon circumstances that changed prior to the filing of the petition.  In those schedules (both sets),
the Debtor stated that she expected her income to go down based upon her working on a PRN (as
needed) basis.  Indeed, the Debtor confirmed this pessimistic forecast at the trial, wherein she
testified that her income did in fact go down.  How much or when this reduction of income took
place was not specified.

The Debtor stated in her latest sworn schedules that she had disposable income of $153.49.
Her proposed plan called for plan payments of $150 a month, leaving a cushion of only $3.49.
While this Court has confirmed Chapter 13 plans with less cushions, it has not done so knowing that
the income figure that supports the disposable income calculation is completely false.  As stated
above, the Debtor testified her income has gone down.  While the Debtor did not elaborate how
much her income has gone down, the Court would feel comfortable finding it has likely gone down
more than $3.49 a month.  Thus, again using the Debtor's own figures and testimony, the Court
cannot find that the Debtor has stable and regular income "to make payments under a [Chapter 13]
plan."

Compounding this mathematical problem, the Debtor also has the problem of her ever-
changing schedule of expenses.  In the Court's view, the new rent figure reflected in the conversion
schedules was derived solely so the Debtor would have a *de minimis* amount of disposable income
to fund a Chapter 13 plan.  In essence, by cutting the rent in half, the Debtor's mother was giving
the Debtor $650 a month to subsidize the Debtor's income in order to be able to make a plan
payment.  The only reason the Debtor can show any disposable income is that the rent expense owed

15

to her parents appears to be completely flexible.  What started as a $2,000 monthly rent (owed by the Debtor and her sister) went down to $1,300 for just the Debtor, and then went down to $650 when it became clear the Debtor needed more income to convert this case to Chapter 13.  There was no new lease agreement, nor anything else memorializing these rent changes.  It appears to the Court that the Debtor (and her parents) manipulated these rental figures solely to reach a number that would result in disposable income being available to fund a Chapter 13.  The Court finds the rental figures set forth in both the Amended Schedule J and the Schedule J filed with the Motion lack any credibility or factual basis.

The Court could stop here, with a finding that the Debtor failed to meet the threshold requirement of showing eligibility to be in Chapter 13 due to her diminished income and malleable expenses.  However, because of the posture of the Chapter 7 case, the Court will also address Gerstenecker's argument that the Motion should be denied due to the Debtor's lack of good faith.

*Marrama* held that the right to convert to Chapter 13, however, is not absolute, and conversion may be denied where "cause" would exist to convert or dismiss the debtor's Chapter 13 case under 11 U.S.C. § 1307(c), including inability to propose a confirmable plan and bad faith. *Marrama* at 373–74; *see also Copper v. Copper (In re Copper)*, 314 B.R. 628, 635 (BAP. 6th Cir. 2004) (collecting cases and citing bad faith, abuse of process, fraud, and futility among the reasons for denying conversion), *aff'd, Copper v. Copper (In re Copper)*, 426 F.3d 810 (6th Cir.2005).

Courts have set out several factors to consider when ruling upon a motion to convert to Chapter 13 from Chapter 7.  These include the following:

> (i) whether the debtor is seeking to convert to chapter 13 in good faith (including a review of facts such as the timing of the motion to convert; the debtor's motive in filing the motion; and whether the debtor has been forthcoming with the bankruptcy court and

16

creditors);

(ii) whether the debtor can propose a confirmable chapter 13 plan;

(iii) the impact on the debtor of denying conversion weighed against the prejudice to creditors caused by allowing conversion;

(iv) the effect of conversion on the efficient administration of the bankruptcy estate; and

(v) whether conversion would further an abuse of the bankruptcy process.

*In re Tufano*, 2011 WL 1473384, at 4 (Bankr. M.D. Pa. 2011); *see also In re Grant*, 385 B.R. 627,

632 (Bankr. E.D. La. 2008) (applying the same factors); *In re Yarborough*, 2012 WL 4434053, at

2 (Bankr. E.D. Tenn. 2012).

Applied to this case, these factors weigh against granting the Debtor's Motion. First, the

Court cannot find the Debtor is seeking to convert in good faith. Indeed, it appears, that this is the

latest battle in the Debtor's long war with Gerstenecker. The Debtor filed this Motion shortly after

the Meeting of Creditors and the Notice of Bankruptcy Rule 2004 Examination filed by

Gerstenecker.

As for the Debtor's stated motivation to convert, the Court does not believe that the Debtor

is seeking to convert to avoid increased legal fees in the Chapter 7. Nor does the Court believe that

counsel for Gerstenecker threatened the Debtor with appeal after appeal at the 2004 examination.

Rather, the motive appears clear to the Court that the Debtor would rather pay $9,000 ($150 per

month for 60 months) than possibly have to repay the $74,400 judgment owed to Gerstenecker (if

she should prevail in a 11 U.S.C. § 727 action).

The Court can also find that the Debtor has not been forthcoming with the Court or her

creditors. The original bankruptcy schedules are replete with errors and omissions. The schedules

completely omitted the four bank accounts to which the Debtor's income tax refunds were deposited. The Debtor was aware of these accounts and knew they were, in part, funded with her income tax refunds, yet she deliberately omitted them from her bankruptcy schedules.

Likewise, the Debtor failed to list the real estate business or list its transfer out of her name. The Court finds the Debtor's testimony of complete ignorance as to the real estate business not credible, especially since it was clearly listed on her tax returns, to which she signed. Under the law, one is presumed to know the contents of a document that she signs. Unless the Debtor was not given an opportunity to read the tax return, or could not read the documents due to some language incapacity, or her signature was obtained by fraud, none of which appear here, the Debtor is presumed to know the terms of the document. *Sears, Roebuck & Co. v. Lea*, 198 F.2d 1012 (6th Cir. 1952); *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000) ( in the absence of fraud or willful deceit, one who signs a contract which he has had an opportunity to read and understand, is bound by its provisions); *In re Edwards*, 2017 WL 3037451, at 5 (Bankr. W.D. Ky. 2017). These omissions (bank accounts and real estate business) were intentional and deliberate.

The Debtor has also not been forthcoming with the Court and her creditors by the lack of accuracy in her Schedules I and J. Schedule I was incorrect from the inception of this case. Yet, the Debtor has never amended this schedule to accurately reflect her true income. To date, the Court still does not know what the Debtor's actual income truly is. Schedule J's expenses also suffer from a lack of truthfulness. The malleable rent figure demonstrates the Debtor's willingness to adjust the facts, whenever the need arises.

The second factor also weighs against the Debtor. As demonstrated above, this Debtor could not propose a confirmable plan based upon her income and expenses. Any plan proposed would be

18

opposed on the basis of feasability. Such an objection would have to be sustained based upon the

Debtor's reduced income (assuming, of course, the expense figures were not tweaked yet again).

Moreover, the fact that the Debtor has several monthly plan payments now does not prove that the

plan is feasible when the sworn schedules show a lack of feasibility and the plan calls for payments

over the next 60 months. As it stands now, the Court could not confirm the plan proposed by the

Debtor.

       Turning to the third factor, the impact on the debtor of denying conversion weighed against

the prejudice to creditors caused by allowing conversion, this factor also weighs against the Debtor.

The impact upon Gerstenecker, of only recovering some $6,600 on her $74,000 claim is substantial.

The only impact upon the Debtor[8] is that she must proceed under the bankruptcy chapter she

originally chose. While it is true that her discharge could be denied if Gerstenecker is successful

in her § 727 action, this would be due to the Debtor's own improper actions.

       The fourth factor, the effect of conversion on the efficient administration of the bankruptcy

estate, also weighs against the Debtor. The Chapter 7 Trustee has expressed an intent to recover

assets or pursue actions on the Debtor's bankruptcy estate's behalf. While any recovery at this point

is speculative, the Debtor testified that if the case was converted she would not pursue any claims

against her father. Thus, a conversion to Chapter 13 would result in no recovery on these claims,

while remaining in Chapter 7 would allow the Trustee to pursue the claims.

       Finally, the Court finds that any conversion to Chapter 13 at this point would be an abuse

---

[8] There could also be some impact upon the Debtor's father, in that the Chapter 7 Trustee
may pursue any number of actions against the father related to the bank accounts, the
appropriated tax refunds, as well as the loss of the Debtor's interest in the real estate business
without notice or consideration.

19

of the bankruptcy process.  As can be seen from the Debtor's schedules, this is a two party case.
There really is just one creditor, Gerstenecker, and she would prefer the case remain in Chapter 7.
Any risk for conversion really falls on Gerstenecker, because, if she is unsuccessful on her § 727
action and the Trustee fails to recover any proceeds, she may receive nothing should this case close
as a no-asset case.

The acrimony between the Debtor and Gerstenecker goes back years, and has its origins in
an unfortunate domestic separation between the Debtor and Gerstenecker's son.  The Debtor's
Motion is clearly just another attempt by the Debtor to avoid paying on the debt owed to
Gerstenecker, which she has disputed from the beginning.  The Debtor's liability on that debt,
however, is now final after the ruling by the Alabama Supreme Court.  Rather than making true
efforts to repay the debt, the Debtor is still trying to minimize the amount she must pay to
Gerstenecker.  Converting to Chapter 13 and proposing to pay a *de minimis* amount (one she cannot
afford) demonstrates the lengths the Debtor will go to not repay Gerstenecker.  From the outset, this
bankruptcy case has been designed to thwart Gerstenecker.  It was not until it appeared that this case
would not proceed as a simple no-asset Chapter 7 case and that the Debtor's discharge could be
challenged, did the Debtor decide that she wanted to repay her debts through Chapter 13.

## CONCLUSION

Taking all the facts and circumstances together, the Court must deny the Motion.  The Debtor
failed to meet her threshold burden of showing eligibility for Chapter 13.  The Debtor failed to show
that she is an "individual with regular income" and that she could fund a Chapter 13 plan.  The Court
also finds that Gerstenecker met her burden of proof by demonstrating by a preponderance of the
evidence that the Debtor is seeking to convert in bad faith and that any conversion would be an

abuse of the bankruptcy process.  The Motion will, accordingly, be denied.

A separate order will be entered approving the Application.

**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JULIE MARIE WOOD | ) | CASE NO. 18-32555 |
| | ) | CHAPTER 7 |
| Debtors | ) | |
| _____ | ) | |

**ORDER**

Pursuant to the Court's Memorandum entered this same date and incorporated herein by reference,

**IT IS HEREBY ORDERED** that Debtor's Motion to Convert from Chapter 7 to Chapter 13 is **DENIED.**

22